CONSUMERS POWER COMPANY v PUBLIC SERVICE COMMISSION

Docket Nos. 111482, 111483, 111486, 111487, 111719-111726. Argued March 11, 1999 (Calendar No. 11). Decided June 29, 1999.

The Association of Businesses Advocating Tariff Equity (ABATE) petitioned the Public Service Commission for an experimental "retail wheeling" program, under which a customer or end-user would contract for electricity with a supplier other than the utility that owns the power lines in the geographic area in which the customer is located. Because local utilities are interconnected, forming a nationwide grid, intermediate utilities are said to "wheel" electricity across their systems. The other supplier, or third-party provider would use the local utility's system to transmit the electricity to the end-user. The local utility would be compensated for the use of its system.

A referee concluded that the PSC was not preempted by federal law from authorizing retail wheeling and that retail wheeling did not unconstitutionally impair contractual obligations. The referee further determined that, while a third-party provider need not obtain a municipal franchise under Const 1963, art 7, § 29, it must acquire a certificate of public convenience and necessity from the PSC under MCL 460.501 et seq.; MSA 22.141 et seq. The referee recommended that the PSC allow retail wheeling only if the end-user's local utility agreed to provide the service. After examining the statutory framework, the referee concluded that the PSC cannot compel a utility to provide retail wheeling services, but may establish tariffs setting the price, terms, and conditions of a voluntarily provided service, and proposed that the PSC negotiate and authorize voluntary retail wheeling programs.

The PSC rejected the referee's proposed decision, concluding that it may implement a retail wheeling program under the electric transmission act, 1909 PA 106, the public service commission act, 1939 PA 3, and the railroad commission act, 1909 PA 300. It rejected an assertion that federal law preempts states from implementing retail wheeling, but held that third-party providers must obtain a franchise from the municipality in which an end-user is located, as well as a certificate of public convenience and necessity to supply the electricity. It then remanded the case to the referee to determine rates and charges for retail delivery services. After

remand, the PSC established the rates and charges for retail delivery services. The Court of Appeals, MICHAEL J. KELLY, P.J., and REILLY and JANSEN, JJ., affirmed, determining that the PSC has statutory authority to implement an experimental retail wheeling program, and that the PSC order did not infringe the utilities' right to control their management activities. 227 Mich App 442 (1998) (Docket Nos. 187387, 187388, 189396, 189397, 189480, 189481, 189503, 189504).

The plaintiffs appeal, limited to whether the PSC exceeded its authority in ordering the electric utilities to transmit electricity produced and sold by other suppliers to customers in their service areas.

In an opinion by Justice CORRIGAN, joined by Chief Justice WEAVER, and Justices TAYLOR and YOUNG, the Supreme Court *held*:

The PSC lacks statutory authority to order a utility to transmit a third-party provider's electricity through its system to a customer. Thus, it lacked the statutory authority to implement the experimental retail wheeling program.

1. The Public Service Commission has no common-law powers. It possesses only that authority granted by the Legislature. In this case, the PSC relies on the electric transmission act, the public service commission act, the railroad commission act, and 1929 PA 69. It initially characterizes its retail wheeling program as ratemaking, thus falling within its authority under § 7 of the electric transmission act and § 22 of the railroad commission act. The challenged portion of the order, however, does not involve ratemaking. While the PSC can encourage a specific management decision through the exercise of its ratemaking power, it may not directly order the utility to make the decision. Absent specific statutory authority, the decision whether to provide the service rests with the utility's management.

2. The PSC also asserts that § 6 of the public service commission act grants it broad authority over all matters pertaining to public utilities, including the power to order retail wheeling. However, the broad language of § 6 serves as an outline of the PSC's jurisdiction, not a grant of specific powers. Because § 6 furnishes no grant of specific powers, it provides no support for the PSC's order in this case. Likewise, the electric transmission act does not grant the PSC the authority to order retail wheeling, nor does the railroad commission act or 1929 PA 69.

Reversed.

Justice BRICKLEY, joined by Justices CAVANAGH and KELLY, dissenting, stated that the question in this case is determined by § 6 of the electric transmission act, which gives the Public Service Commission the authority to order retail wheeling. The majority misinter-

prets the statutory language relevant to this case and mistakenly characterizes retail wheeling as infringing the managerial prerogatives of the appellant utilities.

Section 6 of the electric transmission act does not have a "plain meaning." While it can conceivably bear the meaning imposed on it by the majority, the PSC's interpretation is more in accord with the meaning of the relevant statutory language and with the context of the statute itself. The first clause of section 6 gives the PSC the power, in its discretion, to order electric current for distribution to be delivered. This clause plainly contemplates the PSC's power to order that electric current be delivered, and strongly implies that production and delivery of electric current are two separate activities. The majority errs in ignoring this grant of authority and preventing the PSC's exercise of it. The second clause authorizes the PSC to order that service be rendered by any electric utility in any case in which it will be reasonable for such service to be ordered. The majority reasons that the first two clauses of § 6 do not confer the power to order a utility to transmit electricity for another provider. The statute does not support the majority's conclusion. Because the text of the clauses fully supports the PSC's order in this case, the judgment of the Court of Appeals and the order of the PSC should be upheld.

Given that the language of the relevant statute is ambiguous, that there is no clear indication of the Legislature's intent, and that the PSC exercises some of the Legislature's policy-making authority in this area, the Supreme Court should avoid striking down the policy decision inherent in the PSC's permissible interpretation of the electric transmission act, and adopt a rule that it should defer to an agency's permissible, policy-based interpretation of the statutes it administers.

The PSC may infringe a utility's management powers if such infringement is contemplated in the PSC's enabling legislation. Thus, the order at issue is not invalid as an infringement on the management prerogatives of the appellant utilities.

*David A. Mikelonis, Jon R. Robinson,* and *H. Richard Chambers*; and *Loomis, Ewert, Parsley, Davis & Gotting* (by *Harvey J. Messing* and *Gary L. Field*) for Consumers Energy Company.

*Foster, Swift, Collins & Smith, P.C.* (by *William K. Fahey* and *Stephen J. Rhodes*), and *Raymond O.*

*Sturdy, Jr.,* and *Bruce R. Maters* for Detroit Edison Company.

*Fraser, Trebilcock, Davis & Foster, P.C.* (by *David E. S. Marvin* and *Michael L. Brady*), for Dow Chemical Company.

*Clark, Hill, P.L.C.* (by *Robert A.W. Strong*), for Association of Businesses Advocating Tariff Equity.

*Jennifer M. Granholm,* Attorney General, *Thomas L. Casey,* Solicitor General, *J. Peter Lark,* Assistant in Charge, and *Robert L. Mol,* Assistant Attorney General, for Attorney General.

*Jennifer M. Granholm,* Attorney General, *Thomas L. Casey,* Solicitor General, *David A. Voges,* and *Henry J. Boynton,* Assistant Attorneys General, for Public Service Commission.

Amici Curiae:

*Cleary, Gottlieb, Steen & Hamilton* (by *Sara D. Schotland*) and *Clark, Hill, P.L.C.* (by *Robert A.W. Strong*), for Electric Consumers Resource Council, American Iron and Steel Institute, and Chemical Manufacturers Association.

CORRIGAN, J. We granted leave in these cases to determine whether defendant Michigan Public Service Commission (PSC) exceeded its statutory authority in ordering the Detroit Edison Company and Consumers Power Company to engage in "retail wheeling." We hold that the PSC lacks the authority to order retail wheeling. Therefore, we reverse the Court of Appeals and vacate the PSC order implementing the experimental retail wheeling program.

I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

In 1992, the Association of Businesses Advocating Tariff Equity (ABATE) petitioned the PSC for an experimental retail wheeling program involving industrial customers. Under retail wheeling, the customer, or "end-user," contracts for electricity with a supplier other than the utility that owns the power lines in the geographic area in which the customer is located. The other supplier, or "third-party provider," uses the local utility's system to transmit the electricity to the end-user. The local utility is compensated for the use of its system.

Retail wheeling effectively "unbundles" a local utility's production and distribution services. Traditionally, a local utility provided a "bundled" product; it generated the electricity and transmitted it to end-users connected to its system of power lines. The industry has, however, undergone changes in recent years. Local utilities have interconnected with one another to form a nationwide grid. Thus, a utility can transmit electricity to an end-user who is not directly connected to its system. When a third-party provider supplies electricity to these end-users, the intermediate utilities are said to "wheel" electricity across their systems. A retail wheeling program requires local utilities to provide these transmission services.

Acting on ABATE's petition, a referee presided over a contested case hearing and issued a proposal for decision. The referee concluded that the PSC was not preempted by federal law from authorizing retail wheeling and that retail wheeling did not unconstitutionally impair contractual obligations. The referee further determined that, while a third-party provider

need not obtain a municipal franchise under Const 1963, art 7, § 29, it must acquire a certificate of public convenience and necessity from the PSC under MCL 460.501 *et seq.*;  MSA 22.141 *et seq.*

The referee recommended that the PSC allow retail wheeling only if the end-user's local utility agreed to provide the service. After examining the statutory framework, the referee concluded that the PSC cannot compel a utility to provide retail wheeling services, but may establish tariffs setting the price, terms, and conditions of a voluntarily provided service. The referee proposed that the PSC negotiate and authorize voluntary retail wheeling programs for Consumers Power and Detroit Edison.

The PSC rejected the referee's proposed decision, concluding that it may implement a retail wheeling program under the electric transmission act, 1909 PA 106 (Act 106),[1] the public service commission act, 1939 PA 3  (Act 3),[2] and the railroad commission act, 1909 PA 300  (Act 300).[3] It reasoned that the program would not intrude on a utility's authority to manage its production and procurement operations. The PSC also rejected the utilities' assertion that federal law preempts states from implementing retail wheeling. It held, however, that third-party providers must obtain a franchise from the municipality in which an end-user is located, as well as a certificate of public convenience and necessity to supply the electricity. The PSC then remanded the case to the referee to determine rates and charges for retail delivery services.

---

[1] MCL 460.551 *et seq.*;  MSA 22.151 *et seq.*

[2] MCL 460.1 *et seq.*;  MSA 22.13(1) *et seq.*

[3] MCL 462.2 *et seq.*;  MSA 22.21 *et seq.*

The PSC established the rates and charges for retail delivery services in its decision after remand. After the PSC ·modified its order on rehearing, Detroit Edison, Consumers Power, and ABATE appealed. The Attorney General cross appealed.

The Court of Appeals affirmed the PSC order in all respects.[4] It determined that the PSC has statutory authority to implement an experimental retail wheeling program, reasoning as follows:

> While the PSC has only those powers conferred on it by the Legislature, [*Union Carbide Corp v Public Service Comm*, 431 Mich 135, 146; 428 NW2d 322 (1988)], the interpretation given to statutes by the agency charged with applying them is entitled to great deference. *In re Quality of Service Standards for Regulated Telecommunication Services*, 204 Mich App 607, 612; 516 NW2d 142 (1994). The PSC did not cite specific sections of Act 106, Act 3, or Act 300 when concluding that those statutes authorize it to implement an experimental retail wheeling program; however, an examination of various provisions of those statutes demonstrates that they support the PSC's decision. Section 2 of Act 106, MCL 460.552; MSA 22.152, gives the PSC "control and supervision of the business of transmitting and supplying electricity . . . ." Supplying electricity must be deemed to include the act of delivering electricity to a customer. Section 6 of Act 106, MCL 460.556; MSA 22.156, allows the PSC to order service to be rendered in any case in which such an order is reasonable. Section 6 of Act 3, MCL 460.6; MSA 22.13(6), authorizes the PSC to regulate services and conditions of service. While this section does not contain a grant of specific powers, it construes the extent of the PSC's jurisdiction and grants the PSC broad authority. *Attorney General v Public Service Comm*, 122 Mich App 777, 786-787; 333 NW2d 131 (1983). Under Act 300, the PSC possesses the same authority over utilities as did the Railroad

---

[4] 227 Mich App 442; 575 NW2d 808 (1998).

Commission over railroads. *Union Carbide, supra* at 156.
Section 22 of Act 300, MCL 462.22; MSA 22.41, authorizes
the PSC to investigate and order adequate service to be ren-
dered. [227 Mich App 451-452.]

The Court further determined that the PSC order
does not infringe the utilities' right to control their
management activities. The Court reasoned that utili-
ties are not required to construct new facilities, com-
pelled to engage in a specific management practice,
or required to enter into any particular contract.
Thus, the Court concluded, the PSC order is lawful and
reasonable because it does not dictate the substance
of management decisions. The Court of Appeals
rejected the parties' other challenges to the PSC order.

This Court granted plaintiffs Consumers Power
Company, Detroit Edison Company, and the Attorney
General their respective applications for leave to
appeal, limited to whether the PSC exceeded its
authority in ordering the electric utilities to transmit
electricity produced and sold by other suppliers to
customers in the service area of the utility.[5]

## II. DISCUSSION

The Public Service Commission has no common-
law powers. It possesses only that authority granted
by the Legislature. *Union Carbide, supra* at 146.
Moreover, this Court strictly construes the statutes
which confer power on the PSC. As this Court
explained in *Union Carbide, supra* at 151, quoting
*Mason Co Civic Research Council v Mason Co*, 343
Mich 313, 326-327; 72 NW2d 292 (1955):

---

[5] 459 Mich 880 (1998).

"The power and authority to be exercised by boards or commissions must be conferred by clear and unmistakable language, since a doubtful power does not exist."

In construing the statutes empowering the PSC, this Court does not weigh the economic and public policy factors that underlie the action taken by the PSC. Retail wheeling implicates many policy concerns, from the most basic questions whether a consumer should be able to choose an electricity supplier and what market structure will ensure adequate power supply to consideration of arguable secondary effects on the environment and shareholders. See, generally, Vander Veen, *Michigan is now entering a new electrical energy field: Competition*, 78 Mich B J 164 (1999). The Legislature, not this Court, is the body that must consider these questions and weigh the economic and social costs and benefits of restructuring. As this Court observed in *Huron Portland Cement Co v Public Service Comm*, 351 Mich 255, 262; 88 NW2d 492 (1958):

> Those are matters of legislative concern. We have had presented to us . . . an issue of law, the statutory authority of the commission in the light of the facts before us to order the service, and upon that, and that only, do we propose to pass.

In this case, the PSC relies on the electric transmission act,[6] MCL 460.551 *et seq.*; MSA 22.151 *et seq.*, the public service commission act, MCL 460.1 *et seq.*;

---

[6] The electric transmission act, 1909 PA 106 as amended by 1921 PA 274, granted the Michigan public utilities commission authority to regulate electric utilities. The Legislature abolished the public utilities commission in 1939 and transferred its powers to the PSC. MCL 460.4; MSA 22.13(4).

MSA 22.13(1) *et seq.*, the railroad commission act,[7] MCL 462.2 *et seq.*; MSA 22.21 *et seq.*, and 1929 PA 69, MCL 460.501 *et seq.*; MSA 22.141 *et seq.* We examine those statutes to ascertain whether the PSC has the authority to order retail wheeling. *Union Carbide, supra* at 146. The PSC's determination regarding the scope of its authority is one of law, which we review de novo.[8] *McAuley v General Motors Corp*, 457 Mich 513, 518; 578 NW2d 282 (1998).

### A. RATEMAKING POWER

The PSC initially characterizes its retail wheeling program as ratemaking, thus falling within its authority under § 7 of the electric transmission act, MCL 460.557; MSA 22.157, and § 22 of the railroad commission act, MCL 462.22; MSA 22.41. See also MCL

---

[7] The PSC, as the successor to the public utilities commission, has the "same measure of authority with reference to such utilities as is granted and conferred with respect to railroads and railroad companies under the various provisions of the statutes creating the Michigan railroad commission and defining its powers and duties." MCL 460.54; MSA 22.4.

[8] All rates, fares, charges, classifications and joint rates fixed by the PSC and all regulations, practices and services prescribed by the PSC are deemed prima facie lawful and reasonable. MCL 462.25; MSA 22.44. A party challenging a PSC order bears the burden of proving that it is unlawful or unreasonable. MCL 462.26(8); MSA 22.45(8). An order is unlawful if it is based on an erroneous interpretation of a statute. *Ass'n of Businesses Advocating Tariff Equity v Public Service Comm*, 219 Mich App 653, 659; 557 NW2d 918 (1996). Although this Court ordinarily accords an agency's longstanding interpretation of a statute due deference, *Ludington Service Corp v Acting Comm'r of Ins*, 444 Mich 481, 505; 511 NW2d 661 (1994), amended 444 Mich 1240 (1994), we grant no deference to the PSC interpretation in this case because the plain meaning of the statutes are controlling. *Union Carbide, supra* at 151. An agency interpretation cannot overcome the plain meaning of a statute. *Ludington Service, supra* at 505. Even under the dissent's view of the proper deference courts should give to an agency's construction of the statute that grants it authority, we need not defer to the PSC interpretation in this case because the language of the statute is plain. As discussed below, we conclude that the plain language of the statutes do not grant the PSC authority to order retail wheeling.

460.6a; MSA 22.13(6a). The challenged portion of the order does not, however, involve ratemaking. Although retail wheeling has a ratemaking component, i.e., the establishment of the rate a third-party provider must pay to transmit power through a local utility's system, appellants do not challenge that aspect of the experimental program. Instead, appellants contend that the PSC cannot order local utilities to transmit electricity from a third-party provider's system through its own system to an end-user. This aspect of retail wheeling is simply not ratemaking.

This Court explained in *Union Carbide, supra* at 148, that the PSC's authority to regulate a utility's rates and charges does not include the power to make management decisions. We quoted *Missouri ex rel Southwestern Bell Telephone Co v Public Service Comm*, 262 US 276, 289; 43 S Ct 544; 67 L Ed 981 (1923), to emphasize our point:

> It must never be forgotten that while the State may regulate with a view to enforcing reasonable rates and charges, it is not the owner of the property of public utility companies and is not clothed with the general power of management incident to ownership. [*Union Carbide, supra* at 148-149.]

In *Union Carbide*, we concluded that, although the PSC could preclude a utility from passing along increased charges incurred from its noneconomic operation of facilities, it could not order the utility to cease those operations. In other words, the PSC can encourage a specific management decision through the exercise of its ratemaking power, but it may not directly order the utility to make the decision. Similarly, in *Huron Portland Cement, supra*, this Court considered whether the PSC had the authority to order

a utility to render service to an end-user in an area it did not serve and in which it had no power lines. This Court concluded that, absent specific statutory authority, the decision whether to provide the service rests with the utility's management. *Id.* at 268.

In this case, the PSC attempts to compel utilities to provide a new service—the transmission of electricity from a third-party provider's system to an end-user who is not directly connected to that system. Retail wheeling would require that utilities accept power from suppliers chosen not by management, but by an end-user, and necessitate the negotiation of new interconnection agreements or modification of existing ones. Further, the utility would have to adjust its own production and purchases of power to ensure sufficient capacity to transmit the third-party provider's electricity. Absent a statute clearly conferring on the PSC the power to order such service, the decision to provide the service lies within the province of the utility's management, not the PSC. *Union Carbide, supra* at 151; *Huron Portland Cement, supra* at 261.

### B. THE PUBLIC SERVICE COMMISSION ACT

The PSC next asserts that § 6 of the public service commission act, MCL 460.6; MSA 22.13(6), grants it broad authority over all matters pertaining to public utilities, including the power to order retail wheeling. In 1939, the Legislature enacted the public service commission act to abolish the public utilities commission and transfer its powers and duties to the newly created public service commission. *Huron Portland Cement, supra* at 264-265. The provision on which the PSC relies provides:

The public service commission is vested with complete power and jurisdiction to regulate all public utilities in the state except a municipally owned utility, the owner of a renewable resource power production facility as provided in section 6d, and except as otherwise restricted by law. The public service commission is vested with the power and jurisdiction to regulate all rates, fares, fees, charges, services, rules, conditions of service, and all other matters pertaining to the formation, operation, or direction of public utilities. The public service commission is further granted the power and jurisdiction to hear and pass upon all matters pertaining to, necessary, or incident to the regulation of public utilities, including electric light and power companies, whether private, corporate, or cooperative; water, telegraph, oil, gas, and pipeline companies; motor carriers; and all public transportation and communication agencies other than railroads and railroad companies.

This Court has consistently held, however, that the broad language of § 6 serves as an outline of the PSC's jurisdiction, not a grant of specific powers.

The broad language [of § 6] furnishes no grant of specific powers. It is an outline of jurisdiction in the commission and does not purport to be more. If, indeed, the general language quoted had the effect of vesting particular, specific, powers in the commission, not only would a constitutional question be presented arising from an asserted lack of standards . . . , but there would have been no need whatever for the many statutes enacted (both before and after the effective date of PA 1939, No 3) vesting specific powers in the commission. [*Huron Portland Cement, supra* at 263.[9]]

---

[9] " 'The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend.' " *Livonia v Dep't of Social Services*, 423 Mich 466, 502; 378 NW2d 402 (1985), quoting *Dep't of Natural Resources v Seaman*, 396 Mich 299, 308; 240 NW2d 206 (1976). The statute must contain sufficient standards so as not to "leave the people unprotected from uncontrolled, arbitrary power in the hands of administrative officials." *Id.* at 308-309.

We adhered to this construction of § 6 in *Union Carbide, supra* at 147. Since the PSC has only those powers granted by statute and § 6 furnishes no grant of specific powers, § 6 provides no support for the PSC's order in this case.

## C. THE ELECTRIC TRANSMISSION ACT

The PSC argues that the electric transmission act, MCL 460.551 *et seq.*;   MSA 22.151 *et seq.*, grants it broad authority to regulate all aspects of retail electric service, including services for supplying and delivering electricity, of which retail wheeling is allegedly one. The electric transmission act was the Legislature's first foray into the field of electricity generation and transmission. Sections 1 and 2 of the act provide:

> When electricity is generated or developed by steam, water or other power, within 1 county of this state, and transmitted and delivered to the consumer in the same or some other county, then the transmission and distribution of the same in or on the public highways, streets and places, the rate of charge to be made to the consumer for the electricity so transmitted and distributed and the rules and conditions of service under which said electricity shall be transmitted and distributed shall be subject to regulation as in this act provided. [MCL 460.551;   MSA 22.151.]

> The Michigan public utilities commission, hereinafter referred to as "the commission" shall have control and supervision of the business of transmitting and supplying electricity as mentioned in the first section of this act and no public utility supplying electricity shall put into force any rate or charge for the same without first petitioning said commission for authority to initiate or put into force such rate or charge and securing the affirmative action of

the commission approving said rate or charge. [MCL 460.552; MSA 22.152.]

Contrary to the PSC's assertion, §§ 1 and 2 do not grant it authority to compel a utility to transmit a third-party provider's electricity through its system to an end-user. The grant of control and supervision contained in § 2 is qualified by the language "as mentioned in the first section of this act." Thus, the authority granted by § 2 does not extend beyond the subject matter enumerated in § 1.

The power to regulate the "transmission and distribution" of electricity under § 1 is limited to that "in or on the public highways, streets and places." It does not encompass a utility's lines that extend over private lands. Moreover, a requirement that a utility transmit a third-party provider's electricity does not constitute a "condition of service" under which the utility transmits and distributes electricity. In discussing the distinction between rates and services in *General Telephone Co of Michigan v Public Service Comm*, 341 Mich 620, 636; 67 NW2d 882 (1954), this Court approved the following language from *Elyria Telephone Co v Public Utilities Comm of Ohio*, 158 Ohio St 441, 446; 110 NE2d 59 (1953):

"There is, of course, no doubt that a utility must render adequate service to its patrons, and the general assembly recognizing that at times service might be inadequate has provided a means whereby a utility may be compelled by the commission to improve its services and facilities. The commission has the power to require adequate service under sections 614-21 and 614-27, General Code, but services and rates, although related, are not wholly dependent on each other. As to rates the question is whether the company is receiving a just and reasonable return on the value of its existing property; the question as to adequate service

is whether the company is rendering or is capable of rendering reasonable service with its existing property or whether by improvements, either in the use of the property it owns or by new installations, this can be done."

As used in § 1, the term "service" plainly refers to the utility's supplying its electricity to the end-user, not the use of its lines to transmit another provider's electricity.

The word "service" has different meanings. We construe words and phrases in statutes according to the common usage of the language, but give technical words and phrases their "peculiar and appropriate" meaning. MCL 8.3a; MSA 2.212(1). Black's Law Dictionary (6th ed) defines the term "service" in the context of public utilities as "[t]he furnishing of water, heat, light and power, etc., services by utility." That definition comports with those provided in lay dictionaries.[10] Of the numerous definitions included in *Random House Webster's College Dictionary*, p 1225, the one relevant for our purposes provides: "the supplying or supplier of utilities, commodities, or other facilities that meet a public need, as water, electricity, communication, or transportation." *The American*

---

[10] This Court often consults dictionary definitions to ascertain the generally accepted meaning of a term that is not expressly defined by statute. *Oakland Co Bd of Co Rd Comm'rs v Michigan Property & Casualty Guaranty Ass'n*, 456 Mich 590, 604; 575 NW2d 751 (1998). Dictionaries, however, often contain multiple definitions and define a term using terms that also have multiple definitions. Thus, as the dissent aptly demonstrates, exclusive reliance on dictionary definitions can blur, rather than clarify, the meaning of a word. Dictionaries are, however, merely interpretative aids used by the court. See note, *Looking it up: Dictionaries and statutory interpretation*, 107 Harv L R 1437 (1994). Words are given meaning by context or setting. *Tyler v Livonia Public Schools*, 459 Mich 382, 391; 590 NW2d 560 (1999). In this case, when viewed in context, the plain meaning of the term "service" does not include a utility's transmission of electricity for another provider.

*Heritage Dictionary* (3d ed), p 1649, includes among
its definitions the following: "A facility providing the
public with the use of something, such as water or
transportation." *Webster's New Collegiate Dictionary*
(7th ed), p 793, similarly defines the term as "a facil-
ity supplying some public demand."

Thus, under any definition, the term "service" does
not refer to a utility's transmission of electricity for
another provider. To construe the phrase "conditions
of service" as encompassing a requirement that one
utility transmit another provider's electricity would
require an interpretation that stretches well beyond
the plain statutory language. As we reiterated in
*Union Carbide, supra* at 151, however, the PSC has
only those powers conferred by clear statutory lan-
guage. The power conferred by § 1 simply does not
encompass the PSC's order.

We further note that only electricity generated or
developed "within 1 county of this state, and transmit-
ted and delivered to the consumer in the same or
some other county" falls within the scope of the elec-
tric transmission act. MCL 460.551; MSA 22.151. Retail
wheeling often involves the transmission of electricity
generated within another state. To the extent that the
experimental program required utilities to wheel
power supplied by an out-of-state provider, the pro-
gram would clearly fall outside the scope of the elec-
tric transmission act, even if the act could be con-
strued to grant the PSC the authority to order retail
wheeling.

The PSC also relies on §§ 6 and 7 of the act, which
provide, in pertinent part:

   The commission shall have power in its discretion to
order electric current for distribution to be delivered at a

suitable primary voltage, to any city, village or township
through which a transmission line or lines may pass; to
order service to be rendered by any such electric utility in
any case in which it will be reasonable for such service to
be ordered . . . .  [MCL 460.556;  MSA 22.156.]

   After investigation and hearing, the commission may by
   order fix the price of electricity to be charged by the elec-
   tric utility within lawful limits. . . . The commission may
   establish by order rules and conditions of service that are
   just and reasonable. [MCL 460.557(2); MSA 22.157(2).]

These provisions do not grant the PSC broad author-
ity to order retail wheeling. The first clause of § 6
grants the PSC the power to order that "electric cur-
rent for distribution" be "delivered at a suitable pri-
mary voltage" to a city, village, or township through
which its lines pass. Thus, under the plain language of
the statute, the PSC has the authority to set the pri-
mary voltage at which a utility transmits electricity to
an end-user. Section 6 also authorizes the PSC to order
a utility to provide "service" to a city, village, or town-
ship through which its lines pass. *Huron Portland
Cement, supra* at 265-266. It does not confer the
power to order a utility to transmit electricity for
another provider. Similarly, the authority to establish
"rules and conditions of service" granted in § 7 must
be read in conjunction with § 1. That authority clearly
does not encompass the PSC's order. Accordingly, we
conclude that the electric transmission act does not
grant the PSC the authority to order retail wheeling.[11]

---

   [11] The remaining provisions of the act do not apply. MCL 460.553; MSA
22.153 grants a utility the right to use highways, streets, alleys, and other
public places with the consent of the local unit of government. MCL
460.554;  MSA 22.154 authorizes the PSC to require that utilities submit
information and data regarding the construction of lines in or through
highways, streets, and public places. MCL 460.555; MSA 22.155 grants the

### D. THE RAILROAD COMMISSION ACT

The PSC contends that it may order retail wheeling under § 22 of the railroad commission act, MCL 462.22; MSA 22.41, which empowers the PSC to, upon complaint, investigate and remedy unreasonable or inadequate practices and services. MCL 460.54; MSA 22.4 grants the PSC the "same measure of authority" with reference to utilities as the Michigan Railroad Commission once had over railroads under the railroad commission act. As we noted in *Union Carbide, supra* at 156, however, the railroad commission "did not enjoy sweeping powers . . . ." We conclude that the PSC's commensurate authority does not include the power to require a utility to provide transmission services for third-party providers.

By statute, the Legislature required railroads to transfer and deliver freight, cars, or passengers carried on another line that are destined to a point on its line or a connecting line. MCL 462.7(a); MSA 22.26(a). As MCL 462.7(a); MSA 22.26(a) aptly demonstrates, the Legislature has expressly required that public service providers open their facilities to other providers when it deems appropriate. The Legislature recognized a similar need involving telephone service in 1913, and granted the Railroad Commission the authority to order local providers to interconnect their lines and perform switching service for the

---

PSC the power to inspect and examine an electrical apparatus installed in any public highway, street, or place, as well as order improvements. Under MCL 460.558; MSA 22.158, a utility and its officers and employees are subject to fines if they violate PSC orders. The final section of the act, MCL 460.559; MSA 22.159, governs its scope, providing that the act does "not apply to the transmission or use of electricity for the purpose of conveying intelligence by telegraph, telephone or by other methods now or hereafter adopted therefor."

transmission of messages between the lines. 1913 PA 206, repealed by 1991 PA 179.[12] Absent a comparable statutory provision, the PSC cannot mandate that an electric utility transmit a third-party provider's electricity to an end-user.

### E. 1929 PA 69

The PSC further argues that the requirement under 1929 PA 69, MCL 460.501 *et seq.*; MSA 22.141 *et seq.*, that a utility obtain a certificate of public convenience and necessity from the PSC before it renders service authorizes the PSC to encourage competition in the industry. Although the PSC has historically used its power to issue certificates to prevent, rather than promote, competition, the PSC may allow more than one utility to provide service in an area under the terms of the act. *Huron Portland Cement, supra* at 267. The PSC's ability to foster competition, however, does not include retail wheeling because it lacks authority to order an existing utility to share its capital facilities. As this Court observed in *Huron Portland Cement*, quoting Barnes, Economics of Public Utility Regulation, p 229:

"The requirement of a certificate of convenience and necessity may enable the commission to prevent the needless multiplication of companies serving the same territory, and at the same time to avoid a wasteful duplication of capital facilities, thus keeping the investment at the lowest figure consonant with satisfactory service. By protecting the utility from unnecessary competition, the risks inherent in the utility investments are reduced and the cost of capital is

---

[12] In 1995, the Legislature "unbundled" local telephone exchange services. MCL 484.2351 *et seq.*; MSA 22.1469(351) *et seq.*

thereby kept as low as the conditions of the investment market permit." [*Huron Portland Cement, supra* at 267-268.]

1929 PA 69 does not grant the PSC the authority to order retail wheeling.

### III. CONCLUSION

We express no view regarding the public policy implications of retail wheeling. The economic wisdom of the program is not our concern. See *Huron Portland Cement, supra* at 261. The question before us involves the PSC's statutory authority. We conclude that the PSC lacks statutory authority to order a utility to transmit a third-party provider's electricity through its system to a customer. Thus, the PSC lacked the statutory authority to implement the experimental retail wheeling program. We therefore reverse the judgment of the Court of Appeals and vacate the PSC order implementing the program.

WEAVER, C.J., and TAYLOR and YOUNG, JJ., concurred with CORRIGAN, J.

BRICKLEY, J. (*dissenting*). The majority misinterprets the statutory language relevant to this case and mistakenly characterizes retail wheeling as infringing the managerial prerogatives of the appellant utilities. For these reasons, I respectfully dissent.

I

At issue in this case is the Public Service Commission's interpretation of the statutes in which the Legislature delegated authority to the PSC to oversee electric utilities in Michigan. The majority "grant[s] no

deference to the PSC interpretation in this case because the plain meaning of the statutes are controlling." *Ante* at 157, n 8, citing *Union Carbide Corp v Public Service Comm*, 431 Mich 135, 151; 428 NW2d 322 (1988).

While I agree with much of what the majority holds, I cannot agree that the relevant section of the electric transmission act has a "plain meaning."[1] This statute can conceivably bear the meaning imposed on it by the majority, but the PSC's interpretation is more in accord with the meaning of the relevant statutory language and with the context of the statute itself. This case also demonstrates that courts should defer to an agency's reasonable interpretation of the statutes it is designated to enforce.

A

The majority holds that the electric transmission act, MCL 460.551 *et seq.*; MSA 22.151 *et seq.*, does not give the PSC the power to order retail wheeling. I would hold that the most reasonable interpretation of § 6 of this act gives the PSC this power. MCL 460.556; MSA 22.156.

Section 6 provides, in relevant part, that

---

[1] Because § 6 of the electric transmission act gives the PSC the power in question, I would not reach the other statutory interpretations discussed by the majority. MCL 460.556; MSA 22.156. However, I do agree with the majority that § 6 of the public service commission act, MCL 460.6; MSA 22.13(6), is only "an outline of the PSC's jurisdiction, not a grant of specific powers." *Ante* at 160, citing *Huron Portland Cement Co v Public Service Comm*, 351 Mich 255, 263; 88 NW2d 492 (1958). I further agree that §§ 1 and 2 of the electric transmission act, MCL 460.551, 460.552; MSA 22.151, 22.152, are not applicable to the instant case "[t]o the extent that the experimental program required utilities to wheel power supplied by an out-of-state provider . . . ." *Ante* at 164.

[t]he commission shall have power in its discretion to order electric current for distribution to be delivered at a suitable primary voltage, to any city, village or township through which a transmission line or lines may pass; to order service to be rendered by any such electric utility in any case in which it will be reasonable for such service to be ordered . . . .

The language of this section bears repeating: the PSC has "power *in its discretion* to order electric current for distribution *to be delivered* . . . ." *Id.* (emphasis supplied). This first clause of § 6 plainly contemplates the PSC's power to order that electric current be delivered,[2] as well as strongly implying that the production and delivery of the electric current are two separate activities. Because the Legislature delegated discretionary power to the PSC to order that electric current be delivered over already existing transmission lines, the majority errs in ignoring this grant of authority and preventing the PSC's exercise of it.

The majority also errs in its interpretation of the second clause of § 6. In that clause, the Legislature authorized the PSC to "order service to be rendered by

---

[2] "Deliver" is relevantly defined as "[t]o bring or transport to the proper place or recipient; distribute." *The American Heritage Dictionary* (3d ed), p 494. Another dictionary defines it as "to carry and turn over (letters, goods, etc.) to the intended recipient or recipients." *Random House Webster's College Dictionary*, p 358.

The statute limits the scope of the PSC's power under this section to "any city, village or township through which a transmission line or lines may pass . . . ." MCL 460.556; MSA 22.156. Thus our decision in *Huron Portland Cement Co*, n 1 *supra*, is consistent with this statute. In that case, we overturned a PSC order that would have compelled Consumers Power to build new transmission lines. We noted that § 6 did not give the PSC this power because "Consumers' lines do not pass through the city . . . in which Huron seeks the service to be rendered." *Id.* at 266.

In stark contrast, the order at issue in the instant case would compel the appellant utilities to deliver electric current over their already existing transmission lines.

any such electric utility in any case in which it will be reasonable for such service to be ordered . . . ." MCL 460.556; MSA 22.156. The majority reasons that the first two clauses of § 6 do "not confer the power to order a utility to transmit electricity for another provider." *Ante* at 165. The statute does not support the majority's conclusion.

"Service," as the majority notes elsewhere in its opinion, means " '[t]he furnishing of water, heat, light and power, etc., services by utility.' " *Id.* at 163, quoting Black's Law Dictionary (6th ed), p 1368. The majority looks no further into this definition, however, and concludes that the word "service" necessarily denotes the joint production and transmission of electric current. The definition of "service" is not so constrained, however, as a closer look at the majority's definition reveals.

While "service" means the "furnishing of . . . power," "furnish" is defined in the same dictionary as "[t]o supply, provide, or equip, for accomplishment of a particular purpose." *Id.* at 675.[3] "Supply" is defined as "the act of furnishing what is wanted," *id.* at 1439, and a "supplier" is "[a]ny person engaged in the business of making a consumer product directly or indirectly available to consumers; includes all persons in the chain or production and distribution of a consumer product . . . ." *Id.*[4]

---

[3] Black's further definition of "furnish" is instructive by way of analogy: "As used in the liquor laws, 'furnish' means to provide in any way, and includes giving as well as selling. As used in the Controlled Substances Act, means [sic] to provide or supply and connotes a transfer of possession." *Id.* In neither of these contexts is it necessary to produce or manufacture the commodity in question in order to "furnish" it to a third party.

[4] Compare this definition of "supplier" with the majority's quotation of one of the relevant definitions of "service": " 'the supplying or supplier of

Unlike the majority, I cannot conclude that the word "service" can only mean the joint act of producing the commodity in question and delivering it to the consumer. Indeed, the common definitions of the relevant terms allow for "service" to include separate production, separate distribution, *or* both together.[5] In light of these common definitions, and the distinction made by the first clause of § 6, between the act of producing electric current and the act of delivering it, there is no reason to read the PSC's discretionary power to order "service to be rendered" as meaning solely the power to order the combined production and delivery of electricity.

The majority's statutory analysis ignores the first clause of § 6, and does not take into account the full meaning of the word "service" in the second clause. Because the text of these two clauses fully supports

utilities, commodities, or other facilities that meet a public need, as water, electricity, communication, or transportation.' " *Ante* at 163, quoting *Random House Webster's College Dictionary, supra,* p 1225. A utility is therefore a "supplier" of electric service whether it produced the electric current, or delivered it, or both.

[5] The majority quotes the following relevant definitions of "service": "the supplying or supplier of utilities, commodities, or other facilities that meet a public need, as water, electricity, communication, or transportation." *Random House Webster's Dictionary,* p 1225; "A facility providing the public with the use of something, such as water or transportation." *The American Heritage Dictionary* (3d ed), p 1649. *Ante* at 163-164.

The *Random House* dictionary goes on to define "supply" as "1. to furnish or provide (a person, establishment, etc.) with what is lacking or requisite: *supplying the poor with clothing.* 2. to furnish or provide (something wanting or requisite): *supplied needed water to the region." Random House Webster's, supra,* pp 1295, 1343. The *American Heritage* dictionary defines "provide" as "1. To furnish; supply: *provide food and shelter for a family.* 2. To make available; afford: *a room that provides ample sunlight through French windows." American Heritage Dictionary, supra,* p 1458. None of these definitions carry the implication that the supplier or provider of the commodities in question had to have produced or manufactured them before providing or supplying them to the recipients.

the PSC's order in this case, I would uphold the judgment of the Court of Appeals and the order of the PSC.

B

This case also presents an important question of this state's jurisprudence: whether the agency or the courts should have the authority to determine which of several permissible interpretations should be given to an agency's jurisdictional statute. Clearly, where the language of the statute in question is plain, statutory construction is not permissible by any authority, and no real question is presented. *Ludington Service Corp v Acting Comm'r of Ins*, 444 Mich 481, 505; 511 NW2d 661 (1994), amended 444 Mich 1240 (1994); see *Chevron USA, Inc v Natural Resources Defense Council, Inc*, 467 US 837, 843, n 9; 104 S Ct 2778; 81 L Ed 2d 694 (1984). As discussed in part I(A), however, that is not the situation presented by the instant case.

The majority's interpretation of § 6 of the electric transmission act is not persuasive, but I do not believe that it is impermissible under the language of the statute. The intent of the Legislature with respect to the instant controversy is not clear from the text of the statutes in question. In light of this lack of clear legislative intent, this case presents us with a good opportunity to examine how a court should determine which of two or more permissible interpretations of a statute is the proper one.

1

This Court has not always been consistent regarding the degree of deference courts should give to an agency's interpretation of the statutes the Legislature

delegatèd that agency to enforce. The majority today recites that "this Court ordinarily accords an agency's longstanding interpretation of a statute due deference . . . ." *Ante* at 157, n 8, citing *Ludington, supra* at 505. This rule, in focusing on the "longstanding" nature of the interpretation in question, serves the important purpose of furthering settled expectations. *Magreta v Ambassador Steel Co*, 380 Mich 513, 521-523; 158 NW2d 473 (1968) (BLACK, J., concurring); see *Wehmeier v W E Wood Co*, 377 Mich 176, 191-192; 139 NW2d 733 (1966).

This Court has also noted that

> " '[t]he construction given to a statute by those charged with the duty of executing it is always entitled to the most respectful consideration and ought not to be overruled without cogent reasons.' " [*Magreta, supra* at 519, quoting *Boyer-Campbell Co v Fry*, 271 Mich 282, 296; 260 NW 165 (1935), in turn quoting *United States v Moore*, 95 US (5 Otto) 760, 763; 24 L Ed 588 (1877).]

This rule has been followed in a number of our cases, without reference to the length of time the administrative interpretation has been in existence. *Adrian School Dist v MPSERS*, 458 Mich 326, 336; 582 NW2d 767 (1998); *Empire Iron Mining Partnership v Orhanen*, 455 Mich 410, 416; 565 NW2d 844 (1997); *Breuhan v Plymouth-Canton Comm Schools*, 425 Mich 278, 282-283; 389 NW2d 85 (1986); see *People ex rel Simmons v Anderson*, 198 Mich 38, 47; 164 NW 481 (1917).

Some of our cases have stated that our Court, "in common with all modern courts, give[s administrative interpretations] 'respectful consideration' as one of the factors to be considered in arriving at the probable legislative intent." *Lorraine Cab v Detroit*, 357

Mich 379, 384; 98 NW2d 607 (1959), citing *Howard Pore, Inc v State Comm'r of Revenue*, 322 Mich 49; 33 NW2d 657 (1948).[6] This rule was also stated in *Boyer-Campbell, supra* at 297, and *Owosso Bd of Ed v Goodrich*, 208 Mich 646, 652; 175 NW 1009 (1920).

In perhaps our most candid statement, we noted that appellate courts "will give the agency's construction such weight as [they] conclude[] is appropriate on full consideration of the statutory criteria and the record of the case on review." *West Bloomfield Hosp v Certificate of Need Bd*, 452 Mich 515, 524; 550 NW2d 223 (1996). I am concerned that our standard of review of the legal interpretations of agencies is inconsistent. I believe that predictability in this area may only be achieved by determining the principles underlying such review.

2

The majority provides the firmest ground for such an underlying principle when it states that, "[i]n construing the statutes empowering the PSC, this Court does not weigh the economic and public policy factors that underlie the action taken by the PSC." *Ante* at 156. I agree with this statement, and I suggest that we can avoid making a policy decision in this case by recognizing the Legislature's delegation of certain pol-

---

[6] In one case, we held that "[i]t is the responsibility of the judiciary to interpret legislative intent and this responsibility cannot be delegated. We agree with the Court of Appeals that consideration should be afforded to the MESC interpretation of this section. We cannot abdicate our ultimate responsibility." *General Motors Corp v Erves*, 395 Mich 604, 621; 236 NW2d 432 (1975). Four justices of this Court split on this decision, however, with three justices abstaining.

icy-making authority to the PSC, and deferring to that authority.[7]

The Legislature's ability to delegate authority to an agency is bounded only by the constitution, and there is no allegation of unconstitutional delegation of legislative authority in this case. Cf. *City of Livonia v Dep't of Social Services*, 423 Mich 466, 501-505; 378 NW2d 402 (1985). Therefore, given that the relevant statutory language is ambiguous, that there is no clear indication of the Legislature's intent, and that the PSC exercises some of the Legislature's policy-making authority in this area, this Court should avoid striking down the policy decision inherent in the PSC's permissible interpretation of the electric transmission act.

The United States Supreme Court has held that "the principle of deference to administrative interpretations"

> "has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations." [*Chevron, supra* at 844, quoting *United States v Shimer*, 367 US 374, 382; 81 S Ct 1554; 6 L Ed 2d 908 (1961) (citations omitted).]

The Court further stated that if the agency's choice represents

---

[7] Again, I agree that the Court would be acting properly if the statute at issue were, indeed, unambiguous. Since the statute is ambiguous, however, the Court must rely on something other than its "plain language" in construing what the statute means.

"a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." [*Id.* at 845, quoting *Shimer, supra* at 383.]

The United States Supreme Court has also extended this rule to sanction deference to an agency's interpretation of its jurisdiction under its enabling legislation, noting that "there is no discernible line between an agency's exceeding its authority and an agency's exceeding authorized application of its authority. To exceed authorized application is to exceed authority." *Mississippi Power & Light Co v Moore,* 487 US 354, 381; 108 S Ct 2428; 101 L Ed 2d 322 (1988) (Scalia, J., concurring and citing cases).

For these reasons, and because of a lack of reliable guideposts in determining legislative intent in this case, I would adopt a rule that this Court defer to an agency's permissible, policy-based interpretation of the statutes that it administers.

II

The majority also holds that the PSC order at issue is invalid as an infringement on the management prerogatives of the appellant utilities. *Ante* at 159. Because the majority's own analysis concedes that the PSC may infringe the appellant utilities' management powers if such infringement is contemplated in the PSC's enabling legislation, I disagree that the PSC's orders at issue run afoul of this Court's decisions in *Huron Portland Cement Co v Public Service Comm,* 351 Mich 255; 88 NW2d 492 (1958), and *Union Car-*

*bide, supra.*[8] *Ante* at 159 ("[A]bsent specific statutory authority, the decision whether to provide the service rests with the utility's management").

The majority notes that, in *Union Carbide,* "we concluded that, although the PSC could preclude a utility from passing along increased charges incurred from its noneconomic operation of facilities, it could not order the utility to cease those operations." *Ante* at 158; see *Union Carbide, supra* at 149-150. Our *Union Carbide* decision hinged on the fact that there were no specific statutes that gave the PSC the power to forbid the noneconomic operation of facilities. *Union Carbide, supra* at 150-162.

Furthermore, we specifically noted that the PSC's ratemaking power was sufficient to "exclude[] from Consumers' base rates the increased fuel costs stemming from noneconomic operation . . . . Thus, the commission prevented Consumers' noneconomic operation . . . from adversely affecting both the utility's base rates as well as the charges passed through to ratepayers . . . ." *Id.* at 149. For this reason, the PSC's ratemaking power achieved its stated purpose without shutting down the noneconomic operations, rendering any further use of that power unlawful as beyond its own terms.

Similarly, in *Huron Portland Cement,* we noted that "[t]his is not a case where a utility, already servicing a city, arbitrarily refuses to take on a new (or expanded) burden, for Consumers has never supplied

---

[8] While I disagree with the majority's characterization of the PSC's orders as forcing decisions "within the province of the utility's management," *ante* at 159, I do not reach this question. Because the electric utility act permits the PSC to enforce the orders in question, whether or not they compel "management" decisions is not relevant.

electricity to either the city of Alpena or the Alpena area generally." *Id.* at 260. We went on to examine § 6 of the electric transmission act, and held that its grant of power to the PSC "is not unlimited, but restricted. [The PSC] is given statutory power to order electric current (for distribution) to any community 'through which a transmission line or lines may pass.' " *Id.* at 266.[9]

We held against the PSC's exercise of power in that case because Consumers' power lines *did not* pass through the communities in question. Therefore, "those cases involving an undertaking of service to an area, particularly where a statute empowers the commission to order reasonable extensions of the mains and service . . . , are not controlling on the issue before us." *Id.* at 261 (citations omitted).

For these reasons, I find no guidance in either *Portland Huron Cement* or *Union Carbide*. The question in this case is determined by § 6 of the electric transmission act.

III

Because § 6 of the electric transmission act gives the PSC the authority to order retail wheeling, I respectfully dissent and would affirm the judgment of the Court of Appeals.

CAVANAGH and KELLY, JJ., concurred with BRICKLEY, J.

---

[9] As discussed in part I(A) the statutory authority is, more precisely, "to order electric current for distribution *to be delivered.*" MCL 460.556; MSA 22.156 (emphasis supplied).