# Syllabus

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

*In re* RELIABILITY PLANS OF ELECTRIC UTILITIES FOR 2017–2021

Docket Nos. 158305 through 158308. Argued on application for leave to appeal November 7, 2019. Decided April 2, 2020.

The Association of Businesses Advocating Tariff Equity (ABATE) (Docket Nos. 158305 and 158306) and Energy Michigan, Inc. (Docket Nos. 158307 and 158308) each appealed an order of the Michigan Public Service Commission (MPSC) implementing MCL 460.6w. The MPSC order imposed a local clearing requirement on individual alternative electric suppliers. The name "alternative electric suppliers" reflects that these providers give consumers a choice (i.e., an alternative) about the upstream provider of their power; it has no relationship to renewable energy. The local clearing requirement represented the amount of capacity resources that were required to be in the local resource zone in which the electric supplier's demand was served. Before MCL 460.6w was enacted, the MPSC did not impose a local clearing requirement on individual alternative electric suppliers; the Midcontinent Independent System Operator (MISO)—the regional transmission organization responsible for managing the transmission of electric power in a large geographic area—applied a local clearing requirement as a whole to the geographic area covered by MISO's local clearing requirement. ABATE and Energy Michigan challenged the MPSC's interpretation of MCL 460.6w, and Energy Michigan further asserted that the MPSC order improperly imposed new rules that were not promulgated in compliance with the Administrative Procedures Act (APA), MCL 24.201 *et seq*. The Court of Appeals, METER, P.J., and GADOLA and TUKEL, JJ., consolidated the appeals and reversed the MPSC's decision, holding that no provision of MCL 460.6w clearly and unmistakably authorized the MPSC to impose a local clearing requirement on individual alternative electric suppliers and that the MPSC could impose a local clearing requirement only exactly as MISO does—on a zonal basis. 325 Mich App 207 (2018). Accordingly, the Court of Appeals concluded that the MPSC was not permitted to impose a local clearing requirement on any provider individually. Because the Court of Appeals held that MCL 460.6w did not provide the MPSC with the authority to impose a local clearing requirement on individual alternative electric suppliers, the Court of Appeals found it unnecessary to reach the question whether the MPSC's decision concerning the local clearing requirement resulted in improperly imposed rules that were not promulgated in compliance with the APA. The MPSC and Consumers Energy Company sought leave to appeal in the Supreme Court, and the Supreme Court ordered and heard oral argument on whether to grant the applications or take other action. 504 Mich 894 (2019); 504 Mich 895 (2019).

In a unanimous opinion by Chief Justice McCormack, the Supreme Court, in lieu of granting leave to appeal, *held*:

MCL 460.6w imposes resource adequacy requirements on electric service providers in Michigan and delegates authority to the MPSC to plan for energy capacity in the retail market by setting and enforcing capacity obligations for all energy providers in the state. MCL 460.6w authorizes the MPSC to determine both the local clearing requirement and the planning reserve margin requirement with the same text; no statutory language imposes additional requirements or limitations on the MPSC for setting the local clearing requirement versus the planning reserve margin requirement. However, despite the identical language describing the MPSC's authority for determining both elements of its capacity obligation, the Court of Appeals concluded that there was a difference based on its review of the entire statute. But that conclusion was unfounded; in fact, a contextual review of the statute supported the opposite conclusion. Furthermore, MCL 460.6w requires cooperation with MISO, not adopting MISO's methodology for one capacity obligation only. Nor does the requirement that a capacity charge must coordinate with, and not conflict with, MISO's planning process require the MPSC to duplicate MISO's zonal local clearing requirement. Accordingly, the Court of Appeals misread MCL 460.6w when it read into the statutory text a requirement that the MPSC impose Michigan's local clearing requirement using the same methodology MISO does. The Court of Appeals further misunderstood the differences between the wholesale and retail capacity markets when it held that the MPSC could not impose a local clearing requirement on alternative electric suppliers individually. The planning reserve margin requirement in MCL 460.6w includes no measure of in-zone resources as MISO's does with its zonal resource credits; instead, MCL 460.6w accounts for in-zone capacity in the providers' individual local clearing requirement. And the Court of Appeals did not make clear what the relevant "zone" would be in its interpretation of the local clearing requirement. If it meant that the MPSC could only impose a local clearing requirement that maps exactly onto MISO's zonal measurement, that interpretation would make little sense given MISO's zone geography and the MPSC's authority. A contextual understanding of the MCL 460.6w capacity planning process and MISO's process supports a plain reading of the statute. In requiring that each provider, including alternative electric suppliers, meet an individual local clearing requirement, the MPSC did what the statute required of it to ensure reliability of retail electric markets in Michigan. Accordingly, the Court of Appeals erred when it held that the MPSC could not impose a local clearing requirement on alternative electric suppliers individually.

Reversed and remanded to the Court of Appeals for further proceedings, including addressing whether the MPSC's order complied with the APA.

©2020 State of Michigan



Chief Justice:
   Bridget M. McCormack

Chief Justice Pro Tem:
   David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

FILED April 2, 2020

S T A T E   O F   M I C H I G A N

SUPREME COURT

*In re* RELIABILITY PLANS OF ELECTRIC
UTILITIES FOR 2017–2021.

ASSOCIATION OF BUSINESSES
ADVOCATING TARIFF EQUITY,

       Appellee,

v                                                                                   No. 158305

CONSUMERS ENERGY COMPANY,

       Appellant,

and

MICHIGAN PUBLIC SERVICE
COMMISSION, ENERGY MICHIGAN,
INC., and MICHIGAN ELECTRIC AND
GAS ASSOCIATION,

       Appellees.

ENERGY MICHIGAN, INC.,

       Appellee,

v

CONSUMERS ENERGY COMPANY,

       Appellant,

and

MICHIGAN PUBLIC SERVICE
COMMISSION and MICHIGAN
ELECTRIC AND GAS ASSOCIATION,

       Appellees.

No. 158306

---

ASSOCIATION OF BUSINESSES
ADVOCATING TARIFF EQUITY,

       Appellee,

v

MICHIGAN PUBLIC SERVICE
COMMISSION,

       Appellant,

and

CONSUMERS ENERGY COMPANY,
ENERGY MICHIGAN, INC., and
MICHIGAN ELECTRIC AND GAS
ASSOCIATION,

       Appellees.

No. 158307

---

2

ENERGY MICHIGAN, INC.,

       Appellee,

v                                      No. 158308

MICHIGAN PUBLIC SERVICE
COMMISSION,

       Appellant,

and

CONSUMERS ENERGY COMPANY and
MICHIGAN ELECTRIC AND GAS
ASSOCIATION,

       Appellees.

---

BEFORE THE ENTIRE BENCH

MCCORMACK, C.J.

In 2016, the Legislature passed Public Act 341 to ensure reliability of the state's electric grid. The act charged the Michigan Public Service Commission (MPSC), which regulates retail electricity markets, with setting what are known as "capacity requirements" for a four-year period. Those capacity requirements are imposed upon the state's electricity providers. MCL 460.6w. As explained below, "capacity" refers roughly to the electrical system's ability to meet future demand, especially at times of very high demand.

At issue here is what exactly the MPSC can require of one category of those providers, known as "alternative electric suppliers," under the act. Alternative electric suppliers sell electricity to retail customers in Michigan, but they use other providers' infrastructure to deliver it. The name "alternative electric suppliers" reflects that these

3

providers give consumers a choice (i.e., an alternative) about the upstream provider of their power; it has no relationship to renewable energy.

As the Court of Appeals correctly observed, Act 341 requires every provider in the marketplace to meet the capacity requirements set by the MPSC, and capacity is measured using both a "planning reserve margin requirement" and a "local clearing requirement." *In re Reliability Plans of Electric Utilities for 2017–2021*, 325 Mich App 207, 224-225; 926 NW2d 584 (2018). To explain, the *planning reserve margin requirement* is the total amount of electricity that a given provider must make available to meet its customers' demand (think quantity). The *local clearing requirement* is the amount of that electricity which the provider must produce or purchase locally (think location). Important to the question we decide here, these are not original concepts. Although the terms have slightly different meanings in different contexts, the body to whom the federal regulator (the Federal Energy Regulatory Commission) has delegated operational responsibility over the wholesale electricity markets affecting most of Michigan, the Midcontinent Independent System Operator (MISO), also uses these terms for its capacity planning.

While the Court of Appeals also correctly observed that the act requires each provider to meet the planning reserve margin requirement and the local clearing requirement as set by the MPSC, it held that "no provision of MCL 460.6w clearly and unmistakably authorizes the MPSC to impose a local clearing requirement on individual alternative electric [suppliers]." *Id*. at 224. The panel's mistaken conclusion hinged on its misunderstanding that the MPSC could impose a local clearing requirement only exactly as MISO does. *Id*. at 225-226.

4

In particular, the panel misread the statute's requirements that the MPSC coordinate with the organizations that are responsible for federal regulation of the wholesale electricity market—in this case, MISO—to mean that the MPSC must impose a local clearing requirement in the very same methodological manner that MISO does. *Id*. at 226. MISO, a different regulatory body from the MPSC with a very different jurisdiction and mandate, imposes a local clearing requirement with reference to certain geographic zones. But Act 341 does not refer to or contemplate zones at all. Moreover, and confusingly, the panel did not say what the relevant "zone" is or might be under MCL 460.6w. And while the panel focused on the lack of clear language allowing the MPSC to impose the local clearing requirement on alternative electric suppliers individually, its holding that the MPSC could impose a local clearing requirement only on providers together within a zone means that the MPSC may not impose a local clearing requirement on *any* provider individually, a logical inference that calls the panel's conclusion into still greater question. In short, its holding misread the statutory language, misunderstood MISO's wholesale capacity measurements, and failed to appreciate how the MPSC's regulatory jurisdiction differs from MISO's.

The Legislature authorized the MPSC to set a planning reserve margin requirement *and* a local clearing requirement for each energy provider in the state, including alternative electric suppliers, and required each, in turn, to meet those capacity measurements individually or face the consequences set by statute. We reverse and remand to the Court of Appeals for further proceedings not inconsistent with this opinion.

5

## I. FACTS AND PROCEDURAL HISTORY

## A. ELECTRICITY MARKETS AND REGULATION

*Background*

Electricity is unique. First, it cannot be stored in very large quantities (yet). Second, for technical reasons implied by the laws of physics (not among the laws this Court interprets authoritatively), the supply of electricity must match demand in real time; otherwise, the electrical system is susceptible to massive and highly disruptive blackouts and brownouts, which can cascade across the state and the country. Third, much of everyday life depends on its reliable supply, from smartphone addiction to the operation of businesses to the defense of the nation. Given electricity's distinct qualities and our dependence on its ready availability for virtually everything, state and federal governments regulate power markets carefully, and the regulatory regime is complex.

By way of relevant background, state governments regulate retail power markets, while the federal government regulates wholesale power markets—where electricity generators send power to those who will ultimately deliver it to consumers—and the transmission of electricity among states.

Given the importance of meeting demand, the federal government also regulates "capacity." As noted above, capacity is the ability to satisfy demand for electricity when demand peaks. In a capacity market, electricity suppliers make the guarantee that they can indeed meet demand at the hypothetical highest-use moments.[1]

---

[1] Regulators overseeing capacity calculate peak demand using the hottest days of the year and add a "reserve margin"—that is, some *extra* capacity—to ensure that suppliers meet even unexpectedly high spikes of demand. See, e.g., *Coalition of Midwest Power*

Michigan has four categories of electricity providers that sell to retail customers: (1) investor-owned utilities, commonly referred to, simply, as utilities (or public utilities); (2) municipally owned utilities (munis); (3) cooperative electric utilities (coops); and (4) alternative electric suppliers. The Legislature delegated regulatory authority to the MPSC to "regulate all rates, fares, fees, charges, services, rules, conditions of service, and all other matters pertaining to the formation, operation, or direction of public utilities." MCL 460.6(1).[2] Because alternative electric suppliers are not public utilities, they are not subject to the MPSC's complete power and jurisdiction, although they are subject to the MPSC for some purposes. Compare MCL 460.6 with MCL 460.10g(1)(a).

*Evolving regulatory regimes*

Historically, geography determined a consumer's electricity provider. The customer base for early utilities, munis, and coops was located within the geographic areas each served. For practical reasons—the wires connecting providers and consumers only ran so far and could carry only so much electricity—a provider could sell electricity only

---

*Producers, Inc v Midcontinent Indep Sys Operator, Inc*, 166 FERC ¶ 61,159, at p 3 (2019). For this opinion, it is sufficient to understand that the regulatory goal is making sure demand will always be enough to meet supply. Electrical capacity is sometimes expressed intuitively by analogy to a shopping mall parking lot. Shopping malls typically build parking lots with far more space than is required on average days. But they do so to plan for the very unusual days (during the holiday shopping periods) when the demand for parking space spikes. But for such sound planning, malls could not accommodate peak demand for parking. The importance of a stable electrical supply makes planning for peak electricity demand essential. Thus, electricity providers offer capacity in the form of promises to supply and demonstrations that they have resources they can call upon to meet demand.

[2] Munis are exempt from this degree of MPSC regulation, MCL 460.6, as are coops, which are owned and self-regulated by the members they serve, MCL 460.33.

within its geographical boundary, and a consumer could not receive service from a provider outside that boundary. This was the noncompetitive era of electricity.

The energy shortages of the 1970s along with technological and infrastructure improvements over recent decades eventually led to policy changes toward increased competition in electricity markets in many parts of the country. Reflecting such dynamics, the Legislature, in 2000, passed the Customer Choice and Electricity Reliability Act, Public Acts 141 and 142 of 2000, MCL 460.10 *et seq*., in part to encourage the MPSC to promote competition in Michigan's electricity market. MCL 460.10(b). The acts allowed Michigan electric customers the opportunity to purchase electricity from an alternative electric supplier—a provider other than a local utility. 2000 PA 141. In 2008, the Legislature passed Public Act 286 to cap alternative electric suppliers' market share by tasking the MPSC with ensuring that no more than 10% of any utility's average retail sales are supplied with electricity from an alternative electric supplier.[3] MCL 460.10a(1)(a). As noted above, alternative electric suppliers provide electricity to retail customers but do not physically deliver it to them. MCL 460.10g(1)(a). They meet demand by delivery through the

---

[3] This applies generally to all providers with some limits. Any retail customer of a coop with a peak load of one megawatt or greater shall be provided the opportunity to choose an alternative electric supplier. MCL 460.10x(1). The governing bodies of munis possess the authority to determine whether to permit their customers to choose an alternative electric supplier subject to the governing body's continuing jurisdiction to regulate rates, charges, terms, and conditions. MCL 460.10y(1).

8

existing local infrastructure.  Electricity sold by alternative electric suppliers may even be generated outside Michigan.[4]

While the MPSC regulates in-state retail energy markets in Michigan, the Federal Energy Regulatory Commission (FERC) regulates interstate wholesale energy and transmission markets under the Federal Power Act, 16 USC 791a *et seq*.  16 USC 824; see also *Fed Energy Regulatory Comm v Electric Power Supply Ass'n*, 577 US ___, ___; 136 S Ct 760, 766; 193 L Ed 2d 661 (2016).  This federal-wholesale and state-retail divide characterized electricity regulation for decades.[5]  The federal and state regulators may share and coordinate responsibility over capacity, sometimes referred to as "resource adequacy."  Federal and state regulators, however, both aim to ensure that suppliers of electricity have enough capacity so that customers have adequate resources available to them (and at fair prices) when demand is high.

The FERC has described this complicated, shared responsibility as follows:

[T]he question of jurisdiction over resource adequacy is a complex matter that represents "the confluence of state-federal jurisdiction."  While we are cognizant of the traditional role of state and local entities in regulating resource adequacy, we are also aware of our responsibility under the [Federal

---

[4] Not every state allows alternative electric suppliers to engage in its retail electricity market.  The 17 states that do, including Michigan, are considered part of a more competitive retail market.  The states allowing some degree of choice are California, Connecticut, Delaware, Illinois, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, Ohio, Oregon, Pennsylvania, Rhode Island, Texas, and Virginia.  Competitive retail markets present a more complicated regulatory puzzle because alternative electric suppliers may obtain energy from another state and sell it within the state.

[5] See generally Robert R. Nordhaus, *The Hazy "Bright Line": Defining Federal and State Regulation of Today's Electric Grid*, 36 Energy L J 203 (2015).

Power Act] to ensure the reliability of the system and that wholesale rates are just and reasonable. We will defer to state and local entities' decisions when possible on resource adequacy matters, but in doing so we will not shirk our congressionally-mandated responsibilities. We find that the adequacy of resources can have a significant effect on wholesale rates and services and therefore is subject to Commission jurisdiction. [*California Indep Sys Operator Corp*, 119 FERC ¶ 61,076, at p 212 (2007) (citation omitted).]

In short, because capacity (resource adequacy) has wholesale as well as retail implications, both federal and state governments regulate it.

Since 1999, the FERC has granted regional institutions known as Regional Transmission Organizations the authority to oversee some aspects of energy markets within large regional areas in order to improve efficiency and grid reliability, eliminate opportunity for discriminatory transmission practices, improve market performance, and facilitate lighter direct federal regulation. *Regional Transmission Organizations*, 89 FERC ¶ 61,285, at p 3 (1999). Regional Transmission Organizations are independent bodies formed as collaborative efforts between public utilities, nonpublic utilities, state officials, and all affected interest groups to address all industry operational and reliability issues. *Regional Transmission Organizations*, 90 FERC ¶ 61,201, at pp 1, 4 (2000). Participation in a Regional Transmission Organization is voluntary for all members—but the FERC's goal was that all providers would promptly participate. *Id*. at 8-9. MISO is a Regional Transmission Organization. *Midwest Indep Transmission Sys Operator, Inc*, 97 FERC ¶ 61,326, at p 1 (2001).[6]

---

[6] MISO has since been renamed. It is now known as the Midcontinent Independent System Operator, not the Midwest Independent System Operator, as it was in its 2001 application.

*Federal capacity requirements within MISO*

MISO has been the primary Regional Transmission Organization overseeing the wholesale electricity markets in the Midwest, including most of Michigan, since it was authorized by the FERC in 2001.[7] *Id.* MISO's capacity market includes resource adequacy planning for its wholesale electric market. In plain English, MISO oversees a market to ensure that the supply of electricity will be sufficient to satisfy unexpectedly high demand. It does so looking ahead for a period of one year, successively.

MISO has divided its geographical jurisdiction into 10 "local resource zones" to maximize efficiency in the different wholesale markets. See Figure 1 below.

Figure 1. Map of MISO's United States Region, Separated by Zone.[8]



---

[7] The MISO coverage region includes at least parts of 15 states: Arkansas, Illinois, Indiana, Iowa, Kentucky, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Montana, North Dakota, South Dakota, Texas, and Wisconsin.

[8] MISO, *2019/2020 Planning Resource Auction (PRA) Results* (April 12, 2019), p 5, available at <https://perma.cc/5VVH-UGUH> (accessed February 24, 2020).

Michigan participates in two of MISO's zones. Most of the Lower Peninsula is in Local Resource Zone 7 (all but the southwest corner of the state, which MISO does not regulate at all; we will return to that point later),[9] and the Upper Peninsula is in Zone 2, along with most of Wisconsin.

The federal capacity planning process—through MISO—works about like this: each annual planning year, MISO requires all energy providers within a given MISO zone, including alternative electric suppliers, to submit documentation of the electric output each provider expects to be able to reliably produce during the upcoming year. MISO uses this reported amount to regulate capacity. In connection with the same forecasting, MISO also sets what it calls a planning reserve margin requirement for each provider. *Midcontinent Indep Sys Operator, Inc*, 165 FERC ¶ 61,067, at p 2 (2018). MISO's planning reserve margin requirement is largely, but not only, a quantity measure; it also includes a location requirement. That is, the planning reserve margin requirement requires each provider to have sufficient "Zonal Resource Credits" from within a given MISO zone. Put differently, to meet its planning reserve margin requirement, as required by MISO, a provider must demonstrate the availability of not only enough capacity, but enough *local* capacity.

---

[9] The southwest portion of Michigan's Lower Peninsula is not included in any MISO region on this map. Although most providers in Michigan joined MISO and are included in one of these two MISO zones, the providers in the southwest corner of the Lower Peninsula did not. Instead, they joined a different FERC-approved Regional Transmission Organization, PJM Interconnection, which coordinates and oversees wholesale electricity markets across all or part of 13 states (Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia) and the District of Columbia. See FERC, *Electric Power Markets* <https://www.ferc.gov/market-assessments/mkt-electric/overview.asp> (accessed February 24, 2020) [https://perma.cc/9YVJ-JDGF].

A local element is an important part of capacity planning because when there are insufficient local resources available to meet demand, resources must come from afar. Given the constraints of the electrical grid in moving power large distances from state to state, distant resources can undermine reliability. See, e.g., Borenstein & Bushnell, *Electricity Restructuring: Deregulation or Reregulation?*, 23 Reg 46, 51 (2000). Thus, there is a connection between the efficient and reliable supply of electricity, on the one hand, and meeting demand at least in part through local resources, on the other hand, which is why efficiency still requires some geographically based planning.

At the risk of slight oversimplification (a risk worth running in this context), technological and infrastructural dynamics presented the opportunity for greater competition by making possible the upstream supply of electricity from providers beyond a local utility only up to a point. To some extent, though, the supply of electricity is still constrained by local and regional factors. There is thus a trade-off between promoting competition in the form of facilitating supply from alternative and potentially far-off sources and protecting reliability by ensuring that most demand is satisfied locally and regionally to avoid the congestion that threatens reliability.

To help strike that balance, MISO determines the amount of local energy required by a provider's planning reserve margin requirement *in part* by imposing the local clearing requirement. The local clearing requirement establishes the total amount of capacity that must originate within a MISO zone to reduce the risk of blackouts. *Midcontinent Indep Sys Operator, Inc*, 165 FERC ¶ 61,067, at p 2 (2018). MISO determines its local clearing requirement first by calculating the amount of resources a zone's grid could reasonably be expected to import during peak demand times. This provides an indication of the extent to

13

which congestion constraints limit the amount of out-of-zone resources that can be used to satisfy (peak) demand. The rest must therefore be supplied locally or zonally in order to meet that demand. *Midcontinent Indep Sys Operator, Inc*, 148 FERC ¶ 61,091, at p 2 (2014). Thus the local clearing requirement is a component of each provider's planning reserve margin obligation, and MISO's "Zonal Resource Credits" are used to verify satisfaction of the local clearing requirement.

Stay with us. There are three ways an electricity provider can accumulate the Zonal Resource Credits to satisfy MISO's version of the local clearing requirement, but one is less attractive than the others. It can: (1) self-supply those in-zone resources (i.e., generate it locally); (2) contract with other providers within the zone (i.e., buy it locally); or, if it cannot do either of those, it can (3) participate in MISO's single-year "Planning Resource Auction." MISO's Planning Resource Auction is an auction to set wholesale capacity prices MISO conducts for each planning year. The auction serves as a marketplace through which any registered provider can sell or purchase units of capacity (essentially, guarantees of an ability to call on resources to meet demand).

After the auction, MISO totals the amount of in-zone capacity the zone's providers report through self-supply (option 1), in-zone contracting (option 2), and the auction (option 3). If MISO concludes that the total in-zone capacity cannot meet demand at the highest peak moments (i.e., cannot satisfy the *local* clearing requirement), MISO punishes those providers in the zone who relied on the auction for enough Zonal Resource Credits to meet their planning reserve margin requirement. MISO does so by raising the auction's

14

clearing price to a "penalty rate."[10] The penalty rate thus increases prices on every provider that cannot meet its planning reserve margin requirement with local resources—that is, those that resorted to the auction. In other words, if MISO believes that too much electricity will be coming into a given zone from other zones thereby jeopardizing reliability, MISO makes it expensive for providers who are not producing or buying electricity within that zone to rely on the capacity auction. *Midcontinent Indep Sys Operator, Inc*, 162 FERC ¶ 61,176, at p 24 (2018).

Thus, for purposes of the wholesale power market overseen by MISO, every provider has individual capacity obligations that include requirements for total quantity (how much power) and location (where it comes from). And with respect to the latter, MISO's planning reserve margin requirement requires each energy provider to produce or purchase in-zone capacity, or risk paying a steep price. MISO's penalty rate is imposed on individual providers—individual providers must pay it, and each provider pays in proportion to the amount it relied on the auction for its Zonal Resource Credits.

---

[10] For any year in which the local clearing requirement is not met, MISO sets the auction rate at the cost of new entry, which is based on the estimated costs to build a new natural-gas-fueled combusting turbine plant in the zone. Historically, the cost of new entry is significantly higher than the auction's clearing price. For example, in MISO's Zone 7 (most of Michigan's Lower Peninsula), the 2017/2018 auction clearing price was $1.50 per unit and the cost of new entry was $260.00 per unit. MISO, *2017/2018 Planning Resource Auction Results* (April 14, 2017), p 8, available at <https://cdn.misoenergy.org/2017-2018%20Planning%20Resource%20Adequacy%20Results87196.pdf> (accessed February 24, 2020) [https://perma.cc/NG3A-65QW].

## B. MISO'S 2016 TARIFF AND PUBLIC ACT 341

The specific authority that Regional Transmission Organizations like MISO derive from the FERC is reflected in "tariffs." The FERC must approve tariffs with respect to all terms and conditions of electrical service, rates charged (prices), schedules, contracts, and service agreements. Thus, when MISO seeks any change in its rate-making authority, it must apply for a new tariff with the FERC. The FERC either approves MISO's tariff, thereby setting rates and other terms, or not.

In November 2016, MISO sought the FERC's approval of a newly proposed three-year capacity auction to complement its single-year auction described above. MISO's goal in devising a three-year auction was greater assurance of longer-term grid reliability (three years instead of one) in states with competitive retail markets. The idea was that the best way to plan for longer-term reliability was to make plans for a longer term. MISO would have allowed these states to permit electricity suppliers to participate in a three-year auction instead of the one-year auction. *Midcontinent Indep Sys Operator, Inc*, MISO Transmittal Letter to the FERC, sent November 1, 2016 (FERC Docket No. ER17-284), p 5, available at <https://perma.cc/7R8Q-5P6J>. MISO's proposal also included giving these states an opportunity to implement a "prevailing state compensation mechanism," which would allow the state, instead of MISO, to take responsibility over its own long-term resource adequacy planning. *Id*. at 24.

More than a month later, with bipartisan support in both chambers and—to complicate matters—while MISO's tariff request for a three-year auction plan was pending before the FERC, the Michigan Legislature passed Public Act 341 to promote and ensure the long-term reliability of Michigan's electric grid. 2016 PA 341; 2016 Senate Journal

16

2137; 2016 House Journal 2502. The act imposes resource adequacy requirements on Michigan's electricity providers in the retail market and enforced by the MPSC.[11]

Because the Legislature passed Act 341 while MISO's application for the multi-year auction was pending before the FERC, the act recognized that the MPSC's specific charge would depend on whether the FERC approved MISO's pending tariff application. If the FERC approved it, then the MPSC could decide whether to allow Michigan electricity suppliers to have the option to participate in the three-year MISO auction, leaving longer-term planning to MISO, or, instead, whether the MPSC would implement a prevailing *state* compensation mechanism that would obviate the need for MISO's planning. MCL 460.6w(1). If the FERC did not approve MISO's pending tariff, Act 341 provided that the MPSC would have to implement a state reliability mechanism—its own plan to ensure the reliability of the state's electric grid, as directed by MCL 460.6w(8). MCL 460.6w(2); MCL 460.6w(12)(h). Act 341 thus reflected a legislative view that if the FERC accepted MISO's proposed tariff to move to a three-year auction, the MPSC would be best equipped to decide whether MISO's increasingly advanced capacity planning was best for Michigan.

---

[11] MCL 460.6w uses the terms "resource adequacy" and "capacity" to explain the obligations providers must meet under the law. Throughout the statute and this opinion, the terms refer to the same idea—an amount of local resources that gives the regulator confidence that the system will be reliably strong to reduce the likelihood of blackouts during the predicted conditions of highest electricity use.

The FERC rejected MISO's tariff.[12] *Midcontinent Indep Sys Operator, Inc*, 158 FERC ¶ 61,128, at p 4 (2017). That triggered the MPSC's obligation under MCL 460.6w to develop and implement a state reliability mechanism. MCL 460.6w(2). The statute required the MPSC to develop a state reliability mechanism that would ensure that each electric provider could meet capacity obligations in the state retail market for four years forward. MCL 460.6w(8) and (12)(h). The statute further required the MPSC to set new "capacity obligations," employing the familiar MISO measurement terms—a *planning reserve margin requirement* (how much) and a *local clearing requirement* (sourced locally). And finally the statute gave the MPSC enforcement tools to use when a provider failed to meet the capacity obligations, necessary for any capacity requirement to work in practice. MCL 460.6w(8).

To meet these new legislative mandates, the MPSC held technical conferences to engage the various electric providers collaboratively about how each would meet the requirements, as the methodology and math in this area can be challenging. *In re Reliability Plans*, order of the Public Service Commission, entered September 15, 2017

---

[12] The FERC's order rejecting MISO's tariff mentioned several reasons: (1) the proposal did not show that it was "just and reasonable, and not unduly discriminatory or preferential"; (2) the proposed multi-year auction would be used only in a small portion of MISO's total load because it only applied in competitive retail markets and would create a bifurcated MISO capacity market by time and price; (3) the FERC was not persuaded that such a market would lead to efficient and desirable outcomes; (4) such a market might create price volatility; and (5) MISO had not explained or provided clear language to show that these bifurcated markets would not lead to improper or inefficient allocations. *Midcontinent Indep Sys Operator, Inc*, 158 FERC ¶ 61,128, at pp 2-4 (2017).

18

(Case No. U-18197), pp 2-4. The MPSC also accepted comments from stakeholders on issues related to timing, methodology, and the local clearing requirement in particular. *Id*.

Act 341 defined the local clearing requirement and the planning reserve margin requirement for state-law purposes as follows:

> "Local clearing requirement" means the amount of capacity resources required to be in the local resource zone in which the electric provider's demand is served to ensure reliability in that zone as determined by the appropriate independent system operator for the local resource zone in which the electric provider's demand is served and by the commission under subsection (8). [MCL 460.6w(12)(d).][13]

> "Planning reserve margin requirement" means the amount of capacity equal to the forecasted coincident peak demand that occurs when the appropriate independent system operator footprint peak demand occurs plus a reserve margin that meets an acceptable loss of load expectation as set by the commission or the appropriate independent system operator under subsection (8). [MCL 460.6w(12)(e).]

Following the MPSC's technical conferences—which included consultation with MISO, as specifically required by MCL 460.6w(8)(c) and (d)—and the comments submitted by stakeholders, the MPSC presented its final order at its September 15, 2017 meeting. *Id*. at 30, 35.

The MPSC concluded that MCL 460.6w authorized it to set a local clearing requirement for each individual provider, requiring that each provider either own or have contractual rights to enough resources within the state to meet a local clearing requirement

---

[13] Each time MCL 460.6w uses the term "the appropriate independent system operator," it refers to the Regional Transmission Organization. It is generally MISO, but, as noted, PJM Interconnection is the appropriate independent system operator for the southwest portion of the state.

as set by the MPSC for four years forward. *Id*. at 47. The MPSC put off implementation of a new local clearing requirement for planning years 2018 through 2021 so that it could gather more information about how to assess it through a formal hearing process. *Id*.[14] The MPSC designed this phased-in approach to mitigate any burden the local clearing requirement placed on alternative electric suppliers in particular. *Id*. at 22-23.

## C. APPEAL OF THE MPSC'S ORDER

The Association of Businesses Advocating Tariff Equity (ABATE) and Energy Michigan, Inc., each appealed the MPSC's September 15, 2017 order. They argued that the MPSC exceeded its authority by determining that it could impose a forward-looking local clearing requirement on individual alternative electric suppliers. The Court of Appeals consolidated the cases and reversed the MPSC's decision. *In re Reliability Plans*, 325 Mich App at 210 & n 3. The panel concluded that MCL 460.6w(8)(c) did not use "clear and unmistakable language" allowing the MPSC to impose a local clearing requirement on alternative electric suppliers individually. *Id*. at 225, citing *Consumers Power Co v Pub Serv Comm*, 460 Mich 148, 155-156; 596 NW2d 126 (1999).[15] The panel

---

[14] The MPSC later opened a contested-case proceeding for determining the process and requirements for a forward locational requirement for generation resources under MCL 460.6w. *In re Contested Case Proceeding*, order of the Public Service Commission, entered October 11, 2017 (Case No. U-18444). The contested case concluded with the MPSC continuing to recommend the incremental approach but allowing certain out-of-zone resources to count as exceptions toward meeting an entity's forward local clearing requirement. *In re Contested Case Proceeding*, order of the Public Service Commission, entered June 28, 2018 (Case No. U-18444), p 131.

[15] Energy Michigan also argued in the Court of Appeals that the MPSC's order imposed new rules on electric providers in Michigan without required compliance under the Administrative Procedures Act, MCL 24.201 *et seq*. *In re Reliability Plans*, 325 Mich App

further concluded that MCL 460.6w authorized the MPSC to impose a local clearing requirement on a zonal basis only and that therefore the MPSC did not have the authority "to impose a local clearing requirement on individual providers." *In re Reliability Plans*, 325 Mich App at 226.

Consumers Energy Company and the MPSC sought leave to appeal. We directed the Clerk to schedule oral argument on the applications, addressing "whether the Court of Appeals erred in holding that 2016 PA 341 does not authorize the Michigan Public Service Commission to impose a local clearing requirement on individual alternative electric suppliers." *In re Reliability Plans of Electric Utilities for 2017–2021*, 504 Mich 894, 894 (2019); *In re Reliability Plans of Electric Utilities for 2017–2021*, 504 Mich 895, 895 (2019).

## II. STANDARD OF REVIEW

We review whether the MPSC exceeded its scope of authority, a question of law, de novo. *Consumers Power Co*, 460 Mich at 157. We also review de novo questions of statutory interpretation. *Mich Ass'n of Home Builders v Troy*, 504 Mich 204, 212; 934 NW2d 713 (2019). Reviewing an issue de novo means that we review the legal issue independently, without deference to the lower court. *People v Bruner*, 501 Mich 220, 226; 912 NW2d 514 (2018).

---

at 210. The panel did not consider this argument, finding it unnecessary to do so once it determined that MCL 460.6w did not provide the MPSC with the authority to impose a local clearing requirement on individual alternative electric suppliers. *Id*. at 234-235. Because the issue goes beyond the scope of the briefing we requested and was not addressed by all parties in the lower courts, we decline to address it, but it should be addressed by the Court of Appeals on remand.

21

## III. ANALYSIS

## ACT 341 AUTHORIZES THE MPSC TO IMPOSE A LOCAL CLEARING REQUIREMENT ON ALL ENERGY PROVIDERS, INCLUDING ALTERNATIVE ELECTRIC SUPPLIERS, INDIVIDUALLY

Final decisions, rulings, and orders of the MPSC must be authorized by law. 1963 Const, art 6, § 28. The MPSC has no common-law powers; it has only the authority granted to it by the Legislature. *Consumers Power Co*, 460 Mich at 155-156. The MPSC has the authority to interpret the statutes it administers and enforces. *Clonlara, Inc v State Bd of Ed*, 442 Mich 230, 240; 501 NW2d 88 (1993). Courts give the agency's statutory interpretation respectful, nonbinding consideration and do not overturn it absent cogent reasons. *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 103; 754 NW2d 259 (2008).

What authority a statute gives an agency is a matter of statutory interpretation. The primary goal of statutory interpretation is to give effect to the Legislature's intent. *Bank of America, NA v First American Title Ins Co*, 499 Mich 74, 85; 878 NW2d 816 (2016). Statutory interpretation begins with examining the plain language of the statute. *Id*. When that language is clear and unambiguous, no further judicial construction is required or permitted. Here, the parties do not dispute that Act 341 delegated authority to the MPSC to plan for energy capacity in the retail market by setting and enforcing capacity obligations for all energy providers in the state. They disagree only about one particular aspect of that authority: whether the MPSC can impose one of those obligations, a local clearing requirement, on alternative electric suppliers individually.

The Court of Appeals correctly concluded that Subsection (8)(b) of the act requires each electric provider to show that it could meet the capacity obligations set by the MPSC,

22

*In re Reliability Plans*, 325 Mich App at 224, and that those capacity obligations include both a planning reserve margin requirement and a local clearing requirement, *id*. at 226. The statute also clearly gives the MPSC enforcement tools to use if a provider fails to show that it can meet these MPSC-set capacity obligations. For electric utilities, the MPSC has full jurisdiction and control, so it may use one of its preexisting regulatory tools. MCL 460.6w(8)(b)(*iii*). For cooperative or municipally owned utilities, the MPSC does not have the same degree of control, but the Attorney General has the power to sue when a provider does not meet its capacity obligations. MCL 460.6w(8)(b)(*ii*). And when an alternative electric supplier cannot make a successful demonstration, the MPSC's tool under the act is to require that the provider pay a "capacity charge" taken up after a contested case under MCL 460.6w(3).[16] MCL 460.6w(8)(b)(*i*).

Yet the Court of Appeals held that the MPSC could not impose a local clearing requirement on alternative electric suppliers individually. *Id*. at 224-225. The panel asserted that "reading MCL 460.6w as a whole indicates that the MPSC must impose a local clearing requirement on alternative electric suppliers in a manner consistent with MISO—that is, on a zonal basis and not individually." *Id*. at 226.[17] While the panel held

_____

[16] The capacity charge is a penalty rate for alternative electric suppliers that do not provide enough local electricity resources. Although the rate amounts may be different, the concept parallels the cost-of-new-entry penalty rate MISO uses for providers who cannot meet in-zone capacity.

[17] The Court of Appeals reached this conclusion without providing any guidance about what it meant by a "zonal basis." Given its reliance on its understanding of MISO's process, a zonal basis could refer to MISO's zones. Or it could define the state as the

23

only that the zonal requirement meant the MPSC could not impose any location requirement on alternative electric suppliers individually, if the MPSC is limited to determining a local clearing requirement only for a zone, *no* individual provider would have to produce or purchase any set amount of locally produced electricity.[18]

This holding reflects a number of missteps. First, it read into the statutory text a requirement that the MPSC impose Michigan's local clearing requirement using the same methodology MISO does. That misreading moreover misunderstood how MISO's local clearing requirement really functions. MISO's zonal local clearing requirement is only a tool for setting *individual provider* in-zone capacity requirements in another capacity measurement—Zonal Resource Credits. In addition, MCL 460.6w does not refer to zones at all, MISO's or any other zones. Nor is it at all clear why zones would be relevant to the MPSC, Michigan's regulator for regulating providers within this state.

A. THE COURT OF APPEALS MISREAD THE TEXT OF MCL 460.6w

The Court of Appeals justified its conclusion that the MPSC could only set a local clearing requirement "on a zonal basis" based on its "review of the entire statute." *In re*

---

relevant zone for this statute. For reasons explored later, neither interpretation makes sense.

[18] Although most utilities use many local resources, the age of generation facilities and availability of in-state resources may change in time. It is possible that even these producers will have to rely on importing resources to meet their customers' demand. See Brief for DTE Energy as Amicus Curiae (November 19, 2018) (Docket No. 158305) at 8 n 6. The purpose of MCL 460.6w is to ensure long-term reliability of the grid, and the MPSC needs to have a mechanism to ensure that all producers help guarantee that the system is not in constant danger of blackouts.

*Reliability Plans*, 325 Mich App at 225.  But that conclusion was not rooted in the statute's text.

As explained, MCL 460.6w authorizes the MPSC to set two capacity obligations—the local clearing requirement and planning reserve margin requirement.  MCL 460.6w(8)(c); see also *In re Reliability Plans*, 325 Mich App at 224.  The statute authorizes the MPSC to determine both obligations with the same text.  The MPSC must "[r]equire . . . that *each* alternative electric supplier, cooperative electric utility, or municipally owned electric utility demonstrate to the commission . . . that [it] . . . owns or has contractual rights to sufficient capacity to meet *its capacity obligations . . . .*"  MCL 460.6w(8)(b) (emphasis added).  No statutory language imposes additional requirements or limitations on the MPSC for setting the local clearing requirement versus the planning reserve margin requirement; they are only addressed in the plural.

Perhaps given this text, the appellees do not challenge the MPSC's authority to impose a planning reserve margin requirement on providers individually; that is what the statute says.  But despite the identical language describing the MPSC's authority for determining both elements of capacity obligation, the Court of Appeals decided there was a difference based on its "review of the entire statute."  *In re Reliability Plans*, 325 Mich App at 225.  That contextual reading, according to the panel, "suggests that the MPSC is obligated to apply the local clearing requirement in a manner consistent with MISO."  *Id*.  We see no contextual reason to ignore the statute's clear language.  The parallel treatment of the MPSC's authority as to both capacity obligations is meaningful—the MPSC can set a planning reserve margin requirement for each provider individually, and it can do the same for a local clearing requirement.

25

No less, we read the contextual language differently too. The statute requires cooperation with MISO, not adopting MISO's methodology for one capacity obligation only.[19] On its face, the statute requires the MPSC to seek the appropriate independent system operator's assistance when it sets a local clearing requirement and planning reserve margin requirement:

> In order to determine the capacity obligations, request that the appropriate independent system operator provide technical assistance in determining the local clearing requirement and planning reserve margin requirement. If the appropriate independent system operator declines, or has not made a determination by October 1 of that year, the commission shall set any required local clearing requirement and planning reserve margin requirement, consistent with federal reliability requirements. [MCL 460.6w(8)(c).]

The statute's emphasis on cooperation makes sense: state retail capacity planning should be coordinated with federal interstate wholesale capacity planning.

The Court of Appeals read the requirement that the capacity obligations were to be "consistent with federal reliability requirements" somehow to mean that the MPSC must "observe MISO's general practice of imposing local clearing requirements on a zonal, not an individual, basis." *In re Reliability Plans*, 325 Mich App at 226. But the text of Subsection 8(c) does not support that reading whatsoever.

_____

[19] Wherever the statute required the MPSC to seek assistance from or coordinate with "the appropriate independent system operator," the Court of Appeals substituted in MISO. *In re Reliability Plans*, 325 Mich App at 216 n 7 (quotation marks omitted). This ignores both that another independent system operator, PJM Interconnection, plays a regulatory role in Michigan and that the voluntary nature of participation in an independent system operator means that MISO may not always be predominant in the state. When this opinion refers to MISO instead of "the appropriate independent system operator" it is to demonstrate that, even operating under the Court of Appeals' assumption, it reached the wrong result.

26

The statute gives the MPSC clear instructions: it must seek the technical assistance of the independent system operator (MISO) in determining the capacity obligations by October 1. *If* the independent system operator (MISO) declines to provide that assistance, or does not provide it by October 1, *then* the MPSC "shall set *any* required local clearing requirement and planning reserve margin requirement, consistent with federal reliability requirements." MCL 460.6w(8)(c) (emphasis added).

In fact, the MPSC sought and received technical assistance from MISO in determining a planning reserve margin requirement and a local clearing requirement before October 1, satisfying Subsection (8)(c). See *In re Reliability Plans*, order of the Public Service Commission, entered September 15, 2017 (Case No. U-18197), pp 30, 35, 48-49. The language of Subsection (8)(c) providing for what the MPSC must do in the event it lacked MISO's assistance by October 1 was therefore not relevant here.

But even if MISO had not provided that assistance (or had not done so by October 1) and the MPSC was therefore to set the capacity measurements "consistent with federal reliability requirements," still the Court of Appeals' interpretation of "consistent with" was flawed. "Consistent" does not mean "exactly the same as." Rather, it means "agreeing or accordant; compatible; not self-contradictory[.]" See *Random House Webster's College Dictionary* (2d ed, 2003); see also *Merriam-Webster's Collegiate Dictionary* (11th ed) ("[M]arked by agreement : COMPATIBLE – usu. used with *with*[.]"). As MISO itself explained, the MPSC's local clearing requirement was consistent with its resource adequacy planning and the FERC's precedent to defer to states that choose different but complementary adequacy requirements.

27

Additionally, the MPSC's authority to assess a penalty—a "capacity charge"—on alternative electric suppliers that do not meet their capacity obligations also requires coordination with the federal resource capacity process. MCL 460.6w(8)(b)(*i*). The Court of Appeals believed that the statutory language in this section also "militate[s] against the MPSC's imposition of any local clearing requirements beyond what MISO has established and instead impose[s] on the MPSC a continuing obligation to observe MISO's general practice of imposing local clearing requirements on a zonal, not an individual, basis." *In re Reliability Plans*, 325 Mich App at 226. This too misreads the text:

> A capacity charge shall not be assessed for any portion of capacity obligations for each planning year for which an alternative electric supplier can demonstrate that it can meet its capacity obligations through owned or contractual rights to any resource that the appropriate independent system operator allows to meet the capacity obligation of the electric provider. The preceding sentence shall not be applied in any way that conflicts with a federal resource adequacy tariff, when applicable. [MCL 460.6w(6)].

The statute requires that if there is a federal resource adequacy process, the MPSC's assessment of a capacity charge cannot "conflict[] with" it. MISO has consistently described the MPSC's proposed plan as complementary to its single-year capacity auction—the federal resource adequacy process. See, e.g., Brief for MISO as Amicus Curiae (November 5, 2018) (Docket No. 158305) at 2. The requirement that a capacity charge must also coordinate with, and not conflict with, MISO's planning process does not require the MPSC to duplicate MISO's zonal local clearing requirement.

"Conflict" is defined as "to be contradictory, at variance, or in opposition; clash; disagree" or "incompatibility or interference, as of one idea, event, or activity with another[.]" *Random House Webster's College Dictionary* (2d ed, 2003); see also *Merriam-*

*Webster's Collegiate Dictionary* (11th ed) (defining "conflict," in part, as "to show antagonism or irreconcilability : fail to be in agreement or accord <his statement conflicts with the facts>"). As MISO has explained, an individually imposed local clearing requirement in the state retail market does not conflict with its wholesale capacity planning process; it meets separate but complementary goals. *In re Contested Case Proceeding*, order of the Public Service Commission, entered June 28, 2018 (Case No. U-18444), p 111 (quoting MISO's August 30, 2017 reply comments to the MPSC's investigation into the electric supply reliability plans of Michigan's electric utilities for the years 2017 through 2021, Case No. U-18197, "Rather, MISO's resource adequacy processes are complementary to the reliability mechanisms of the states").

### B. THE COURT OF APPEALS MISUNDERSTOOD MISO'S CAPACITY PLANNING

The Court of Appeals made another mistake in determining that the MPSC was only permitted to impose a zonal local clearing requirement like MISO does. The panel's interpretation misunderstood the differences between the wholesale and retail capacity markets, and especially MISO's capacity planning process and the local clearing requirement's function in that process.

As explained, MISO's authority is limited to that approved by the FERC, which regulates the interstate power and capacity wholesale and transmission electricity markets. *Electric Power Supply*, 577 US at ___; 136 S Ct at 773.[20] Any rate, rule, or practice the

---

[20] The United States Supreme Court decided *Electric Power Supply* in 2016, in the midst of the 17-month period after which the statute at issue was introduced and when it became Act 341. The United States Supreme Court also decided *Hughes v Talen Energy Mktg,*

FERC approves for MISO's implementation must affect interstate wholesale rates but may not affect retail electricity sales. *Id*. at 774-775. The states have regulatory authority over electricity sales that stay within state boundaries, especially retail sales. *Id*. at 775. While MISO oversees the wholesale markets and the MPSC oversees the retail markets, the two regulatory bodies work cooperatively to ensure grid reliability and work together on capacity planning in particular, relevant to both.

MCL 460.6w codified this cooperation. MCL 460.6w uses capacity measurement vocabulary also used by MISO in its capacity planning and has the same goal—ensuring grid reliability by requiring that each provider supply enough electric capacity and enough local capacity.

The Legislature enacted MCL 460.6w to require each electricity provider to demonstrate enough capacity, including in-state capacity, to meet peak demand. But the statute's planning reserve margin requirement includes no measure of in-zone resources as MISO's does with Zonal Resource Credits; it measures capacity (quantity) only. Instead, the statute accounts for in-zone capacity in the providers' individual local clearing requirement. MCL 460.6w(8).

---

*LLC*, 578 US ___; 136 S Ct 1288; 194 L Ed 2d 414 (2016), which held that a state's program to subsidize new power generation was preempted by federal law. The Court of Appeals cited legislative history to support its reading of the statute, finding meaning in the iterations of the text before the version that passed into law. *In re Reliability Plans*, 325 Mich App at 228-232. The Michigan Chamber of Commerce's brief as amicus curiae explaining that the changes in bill drafts instead reflected the Legislature's shifting view of its authority given these United States Supreme Court opinions persuasively rebuts the panel's assumption about the legislative history. See Brief for the Michigan Chamber of Commerce as Amicus Curiae (October 26, 2018) (Docket No. 158305) at 5.

The Court of Appeals' view that the MPSC must impose its local clearing requirement zonally because MISO uses a zonal measurement provides no hints about the economic tools the MPSC could employ to ensure that each Michigan electricity provider contributed to some zonal local clearing requirement or how the MPSC could restructure market costs—as MISO does—to penalize the providers responsible for years in which they do not meet it. In particular, the Court of Appeals did not make clear what the relevant "zone" would be in its interpretation of the local clearing requirement. If it meant that the MPSC could only impose a local clearing requirement that maps exactly onto MISO's zonal measurement, that interpretation makes little sense given MISO's zone geography and the MPSC's authority. MISO oversees 10 regional zones that span 15 states, and its boundaries are not drawn according to state lines. (See Figure 1 of this opinion again). MISO's Zone 1, for instance, includes all of North Dakota and parts of Montana, South Dakota, Minnesota, Wisconsin, Iowa, and Illinois. All providers in Zone 2—which includes Michigan's Upper Peninsula and most of Wisconsin—and all in Zone 7—which includes most of Michigan's Lower Peninsula only—meet MISO's capacity measurements for the zone in which they participate. The MPSC, in contrast, is charged with ensuring the reliability of Michigan's grid for retail consumers throughout the state.

The MPSC lacks any authority over Wisconsin providers, which it would need to impose a local clearing requirement over MISO Zone 2. And while the MPSC has authority over the southwest corner of the state that participates in a zone regulated by PJM Interconnection, a different Regional Transmission Organization, the MPSC similarly has no authority over those parts of Delaware, the District of Columbia, Illinois, Indiana,

31

Kentucky, Maryland, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia overseen by that system operator.

A contextual understanding of the MCL 460.6w capacity planning process and MISO's process therefore supports a plain reading of the statute.

## IV. CONCLUSION

In requiring that each provider, including alternative electric suppliers, meet an individual local clearing requirement, the MPSC did what the statute required of it to ensure reliability of retail electric markets in Michigan. We reverse the judgment of the Court of Appeals and remand to the Court of Appeals for further proceedings consistent with this opinion, including addressing whether the MPSC's order complied with the Administrative Procedures Act.

Bridget M. McCormack
Stephen J. Markman
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh